**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER LANCE SHOCKLEY,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:09-cv-1096** |
| | ) | **Judge Haynes** |
| **RICKY BELL, WARDEN,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**To: The Honorable William J. Haynes, Jr., United States District Judge**

## REPORT AND RECOMMENDATION

For the reasons explained below, the undersigned **RECOMMENDS** that the petition for writ of *habeas corpus* (Docket No. 1) be **DENIED**, and that this action be **DISMISSED** with prejudice, and that any appeal **NOT** be certified under 28 U.S.C. § 1915(a)(3) as taken in good faith.

## I. INTRODUCTION AND BACKGROUND

The petitioner, Christopher Lance Shockley,[1] has filed a *pro se* petition for a writ of *habeas corpus* under 28 U.S.C. § 2254. (Docket No. 1). The petitioner is an inmate at the Riverbend Maximum Security Institution in Nashville, Tennessee. The petitioner challenges the legality of his confinement under a 2004 judgment of the Criminal Court for Davidson County convicting him of four (4) counts of aggravated sexual battery.[2] (Addendum A, pp. 17-18 ).[3] The trial court sentenced

---

[1] Throughout this memorandum, Christopher Lance Shockley is referred to as "petitioner," "defendant," and "appellant" interchangeably.

[2] On January 23, 2004, a Davidson County Grand Jury returned a true bill against Shockley, charging him with four (4) counts of rape of a child and nine (9) counts of aggravated sexual battery. (Addendum A, pp. 1-14). On June 10, 2004, Shockley pleaded guilty to four (4) counts of aggravated sexual battery. (Addendum A, pp. 29-32; Addendum

the defendant to a total effective sentence of sixteen (16) years imprisonment. (Addendum A, pp. 29-32).

Shockley appealed his sentence to the Tennessee Court of Criminal Appeals. *State v. Shockley*, No. M2004-02086-CCA-R3CD, 2005 WL 1683493 (Tenn. Crim. App. Jul. 18, 2005)(Addendum I). The appellate court affirmed the trial court's imposition of the sixteen (16) year sentence. (Addendum I, *State v. Shockley*, 2005 WL 1683493, at *8). Shockley did not file an application seeking discretionary review by the Tennessee Supreme Court. (Addendum L at p.2).

On April 11, 2006, Shockley filed a *pro se* petition for post-conviction relief in the Criminal Court for Davidson County. (Addendum D, pp. 34-64). On September 21, 2007, Shockley, through appointed counsel, filed an amended petition for post-conviction relief. (Addendum D, pp. 83-91). The petition and amended petition alleged as grounds for relief that petitioner did not receive effective assistance of counsel and that he did not knowingly, voluntarily, and understandingly plead guilty. (Addendum D, pp. 51, 83). On November 20, 2007, a hearing was held. (Addendum E). On January 9, 2008, the post-conviction court issued a lengthy order denying relief. (Addendum D, pp. 97-116).

Shockley appealed. (Addendum D, p. 117). On March 31, 2009, the Tennessee Court of Criminal Appeals affirmed the post-conviction court's denial of relief. *Shockley v. State*, No. M2008-00143-CCA-R3-PC, 2009 WL 856984, at *1 (Tenn. Crim. App. Mar. 31, 2009)(app. denied Aug. 17, 2009)(Addendum L). On May 27, 2009, Shockley filed a *pro se* application for

---

B, pp. 1-11). The four (4) counts of a rape of a child as well as five (5) counts of aggravated sexual battery were dismissed. (Addendum A, pp. 29-31; Addendum B, p.1).

[3] The citations herein are to the technical record filed by the respondent. (Docket Nos. 14 and 21, Addenda). By court order, the technical record is sealed. (Docket No. 15).

discretionary review in the Tennessee Supreme Court. (Addendum M.) On August 17, 2009, the Tennessee Supreme Court issued an order denying Shockley's application. (Addendum M). Shockley did not file a petition for writ of certiorari in the United States Supreme Court.

On November 13, 2009, Shockley filed the instant petition. (Docket No. 1). In his petition, the petitioner asserts two grounds for relief. The petitioner names Ricky Bell, the warden of Riverbend Maximum Security Institution, as the respondent.

Upon its receipt, the court conducted a preliminary examination of the petition and determined that the petitioner had stated a colorable claim for relief. Accordingly, the court entered an order on December 2, 2009, directing the respondent to answer or otherwise respond to the petition. (Docket No. 6). The respondent filed a response urging the court to deny the petition and dismiss the action. (Docket No. 13). The petitioner has not filed a reply in opposition to the respondent's motion to dismiss.

Upon consideration of the record, the court concludes that an evidentiary hearing is not needed. *See Smith v. United States*, 348 F.3d 545, 550 (6th Cir. 2003)(an evidentiary hearing is not required when the record conclusively shows that the petitioner is not entitled to relief). Therefore, the court shall dispose of the petition as the law and justice requires. Rule 8(a), Rules — § 2254 Cases.

Jurisdiction and venue in this court are appropriate under 28 U.S.C. § 2241(d) because the petitioner was convicted in the Criminal Court for Davidson County in Nashville, Tennessee.

## II.    SUMMARY OF THE EVIDENCE

### A.    Trial Court

The following summary of the facts of the case is taken from the opinion of the Tennessee

Court of Criminal Appeals in *State v. Shockley*, 2005 WL 1683493:

> At the July 22, 2004, sentencing hearing, Detective Charles Kenneth Potter of the Metropolitan Police Department's Sex Crimes Unit testified his investigation of the case began on August 29, 2003, upon receipt of a telephone call from a Department of Children's Services ("DCS") caseworker.  He and the DCS caseworker interviewed the defendant on September 4, 2003, during which time the defendant admitted to having engaged in "sexual touching" with the victim. Specifically, the defendant admitted he had touched the victim's breasts with his hands fifteen to twenty times, kissed the victim's breasts ten times, touched the victim's clitoris fifteen to twenty times, and touched the victim.'s "hole" twice. The defendant additionally admitted that the victim had fondled his penis twenty times. Detective Potter testified the defendant told them the victim's mother had walked into the room during one incident to find the victim unclothed. The defendant told them he had explained to the mother that the victim had been hot during the night and he had instructed her to remove her clothing in order to stay cool. Detective Potter testified the victim had just turned thirteen at the time he began his investigation of the case.  He said the defendant told him that the abuse began when the victim was twelve years old and that the last incident occurred in June 2003.
>
> On cross-examination, Detective Potter acknowledged the ultimate source of his knowledge of the abuse resulted from the defendant's having "turned himself into [sic]" the social workers at the Parthenon Pavilion, where he had voluntarily gone for treatment.  He said the Parthenon Pavilion had notified DCS and that DCS had in turn notified him. Detective Potter conceded the defendant had cooperated with the investigation and been forthright in his admissions. He later added, however, that although the police were not contacted until after the defendant divulged the pertinent information to the Parthenon Pavilion workers, the victim had informed her mother of the abuse one or two days before the defendant checked himself into the Parthenon Pavilion. DCS Sex Abuse Investigator Autumn Moultry testified that she participated with Detective Potter in an interview of the victim at her school. She said the victim disclosed

that she had been sexually abused by the defendant, her stepfather, since the age of eleven. Moultry described the victim's specific revelations:

> [The victim] disclosed that [the defendant] had touched her vagina and her breasts with his hands. She told me that the first time it happened that she was eleven and was in the living room, that he touched her vagina on -- on top of her vagina. And he gave her names for it, such as pussy and fever. [The victim] told me that, eventually, she began to have to sleep in the bed with [the defendant] and would have to massage his penis. And precom in her words, precom would come out of his penis. [The victim] told me that one time she got upset and tried to wipe the precom off of her hand. And [the defendant] did not like that and told her why do you do that, you repulse me. [The victim] told me that [the defendant] rubs her vagina on the lump between her folds, and that he touched her hole on approximately three occasions and that felt as a gag reflex. She's also stated that . . . at times [the defendant] would ask her . . . if she liked being touched by him. And if she said no, that he would make her feel guilty, would tell her that she thought that he was ugly or that she didn't love him, that she would have to convince him that she did love him and that she did not think that he was ugly.

Moultry testified that when she received the referral on the case, the victim was thirteen years old. She said she believed the abuse had been ongoing for almost two years and had continued up until approximately two weeks before she received the referral. The victim told Moultry that in July 2002, her mother had discovered the victim sleeping without her panties on in a bed with the defendant. Moultry said the victim told her that the sexual abuse continued to occur after that time. Asked if the victim indicated the frequency of the incidents, Moultry replied

> [The victim] told me that it was pretty much every day that it would happen, either that she would have to show him, like, parts of her body, or that, like, she would walk by him or he would grab her on her buttocks or that she would have to show him body

parts or -- I know that before the mom found her without her panties, that she was sleeping with him practically every night.

On cross-examination, Moultry acknowledged the first allegations of abuse resulted from a report to her office from the Parthenon Pavilion, and neither the victim nor the victim's family had reported the abuse to DCS prior to that time.

Holly Arnold testified she was entering her fifth year as a clinical therapist with the National Child Advocacy Center. She said she had both a Bachelor's and a Master's of Science in Social Work and was "currently in the licensure process." In her position as clinical therapist, she had counseled the victim in weekly therapy sessions since September 11, 2003. She said that as a result of the abuse, the victim had experienced chronic anxiety; depression; nightmares; feelings of extreme anger, worthlessness, and self-loathing; and "intense panic" whenever she was within five feet of any male. Arnold testified that the abuse had "interrupted" the victim's normal sexual development. She said the victim had stated more than once that she felt she had been "permanently damaged" by the abuse. Arnold testified the victim would continue to struggle with these issues for the foreseeable future and she said she saw "no end in sight" for the victim's current treatment process. Moreover, she testified she anticipated that the victim would need to resume treatment at various "developmental stages"of her life.

Arnold testified that the defendant was a parental figure in the victim's mind. She said the victim related an incident where the defendant fondled her while he was on his honeymoon with her mother. Arnold explained that it was her understanding that the victim had accompanied her mother and the defendant on their honeymoon in Gatlinburg. She said the victim described "very manipulative behavior" on the defendant's part. For example, the victim told her that whenever she tried to stop the abuse, the defendant "would mistreat her and her mother to the point that she would do anything to get it [the mistreatment] to stop." The victim also described occasions in which the defendant made her go to the basement to apologize to her but instead molested her again while she was in the basement. Arnold said the defendant's abuse of the victim caused "great damage to [the victim's] trust and boundary issues," and resulted in "almost an inability [on the part of the victim] to trust other people" at the current time. She said the victim had been placed in the care of her grandparents as a result of the abuse, which had

necessitated that she change schools. Arnold testified that although the grandparents provided a safe and loving home to the victim, the victim wanted to live with her mother and felt that the situation had placed "great strains on family relationships." In sum, Arnold testified that the impact of the abuse on the victim had been "very great." She said she would place her "in the 8 or 9 range," "on a scale of one to ten," in terms of the effect it had had on her life.

On cross-examination, Arnold acknowledged that the victim was in the appropriate school grade and performed well academically. She testified, however, that she believed the victim had become "almost focused, solely, on academics . . . as an escape to get through what she's going through." When pressed, she conceded that her belief that the victim would require further therapy at future points in her development was "speculation." She emphasized, however, that such "speculation" was her "clinical opinion" based on her experience, training, and work with the victim over the previous year.

* * *

The defendant, testifying in his own defense, explained the circumstances that led him to seek treatment at the Parthenon Pavilion:

> I noticed that my daughter -- and I know she's my stepdaughter, but I call her my daughter, because I love her that much. And I noticed she was starting to become where she didn't want to be around me, and she was kind of scared of me. And I didn't understand at the time what was going on. So I felt, since she was acting this way, that the best interest of her would be for me to leave the home for a while until we figured out why she was feeling this way towards me. So I left the home. And a couple of months later, my wife called me up. And said she needed to talk to me about something. . . . She came over and told me that . . . [the victim] had told her that I had touched her. And that was why she was acting the way she was acting. And when my wife told me that, I -- that was when it, really, sunk in, though, what I had done, that I had messed up with her. And I got to the point to where I didn't want to live then. I just wanted to kill myself at the time. And me and my wife discussed it. And she convinced me that our family was worth fighting for, that I shouldn't just give up and quit and run out. You

know, if I, really, loved her and [the victim], that I
would be willing to fight for them and do whatever it
took to make things right.

The defendant testified he knew that his disclosures about the victim
would be reported to DCS and that he had agreed for a DCS
employee to interview him while he was undergoing treatment at the
Parthenon Pavilion. He said that when she failed to show up, he
contacted her upon his release from the center and arranged to go to
her office for an interview. The defendant testified he knew he would
be required to serve some jail time for his offenses, but neither he nor
his wife had realized "that the D.A. would be this severe about it."
He said the situation had "devastated" him. Among other things, he
had lost his wife, his "little girl," and his job, been embarrassed, and
incurred thousands of dollars in legal expenses. He promised he
would never again make the same mistake and said that he would
participate in any counseling that was offered.

On cross-examination, the defendant expressed his unhappiness with
the amount of time the prosecutor was seeking for the offenses,
complaining:

I knew I was going to have to do some jail time, but
I, also, thought there was going to be a possibility of
probation, where I could be out and have classes and
work to pay off the legal fees. I mean, that's -- how
much does someone need to suffer? How much more
do I need to suffer before everything is made right?

Asked what he thought would be an appropriate amount of
incarceration, the defendant said he thought that one year in jail,
combined with a period of probation and counseling, would be fair.

*Id*., at **1-5.

### B.    Post-Conviction Court

The Tennessee Court of Criminal Appeals set forth the evidence presented at the post-

conviction hearing in its opinion affirming the denial of relief by summarizing the testimony of each

witness as follows:

At the post-conviction hearing, the following evidence was presented: The Petitioner testified that he initially learned of the charges against him while he was being treated by several doctors. One of those doctors was Dr. Okpaku, who prescribed the Petitioner an anti-depressant, Zoloft, and a sleep aid, Ambien. The Petitioner took the Zoloft daily, and he took the Ambien as needed. He related that the Ambien caused him to "black out ... at times." The Petitioner said that, on several occasions, he took Ambien to sleep and woke up to find things he did not recall touching were moved around within his room. Additionally, the Petitioner testified that one time after he took Ambien, his uncle found him "up" in the middle of the night and had to put him back in bed, none of which the Petitioner remembered. The Petitioner took Ambien the night before his plea hearing "because [he] was really upset." He said that he "remember[ed] getting up in the middle of the night" and that the medicine did not help him sleep "like it normally [did]." Consequently, the Petitioner took more Ambien. He said he did not recall waking the morning of his plea hearing, and he only remembers "bits and parts" of being in court.

The Petitioner initially said that he met with Counsel only once before his plea hearing. The Petitioner then recounted several times that he met with Counsel. Three such times were when they met in jail before the Petitioner made bond, in Counsel's office when the indictments were not yet available, and in Counsel's office before the plea hearing. The Petitioner stated that Counsel told him he would receive an eight-year sentence. The Petitioner thought this was a "bad deal" because of "the circumstances of what happened." The Petitioner said that Counsel did not explain that the Petitioner would have to register as a sex offender and the ramifications of doing so. The Petitioner also said Counsel did not go over the plea petition with him. He stated that he would not have plead guilty if he knew he could have been sentenced to more than eight years.

The Petitioner admitted he had read the guilty plea hearing transcripts, which reflected that the trial judge explained to him the plea's requirements and the possibility of a sentence longer than eight years; however, the Petitioner said that he did not recall that explanation and admonition. He also said the trial court did not ask him if he was on medication when it accepted his guilty plea. The Petitioner said Counsel did not discuss an amendment to the plea

agreement with him. Only at the sentencing hearing, of which the Petitioner claimed he did not understand the purpose, did the Petitioner realize he could be sentenced to over eight years.

The Petitioner remembered meeting with Counsel before the sentencing hearing. He told Counsel he wanted to withdraw his guilty plea because the charges were for "aggravated" sexual battery. The Petitioner said Counsel became angry and walked out.

On cross-examination, the Petitioner said that he was upset because he was sentenced to sixteen years instead of eight. He acknowledged that he pled guilty to four charges that all carried a penalty of eight to twelve years in prison. He also acknowledged that the transcripts of the guilty plea hearing showed that the trial court informed him that it could order his sentences to be served consecutively or concurrently. The Petitioner said he participated in a juvenile court hearing in which S.C., the victim of his crimes, testified that he did not penetrate her. Counsel used this testimony denying penetration when negotiating the Petitioner's guilty plea deal with the State. The Petitioner admitted that, if he had gone to trial, his confession could have been used against him, and that he would have faced a possible sentence of over one hundred years.

The Petitioner testified that he had more than a thirty-day supply of Ambien. He said that, in addition to the Ambien he took the night before, he had also taken Zoloft and "some" Xanax before the plea hearing, which caused him to not "think[ ] clearly and rationally" at the hearing. The Petitioner explained that he did not express any confusion to the judge at the time of the guilty plea hearing because it would have "disrupt[ed] the flow of things." He said, "I just wanted to go through the motion, the formalities. I already had a plea agreement for eight years. So I didn't want to do anything to disrupt that."

The Petitioner reiterated that he tried to withdraw his guilty plea within a week's time of the hearing because he learned he was being accused of "violent charges" and that the charged alleged the victim was less than thirteen years old. He said that he did not have the indictment to read the charge that included the reference to the victim's age.

Dr. Samuel Okpaku, a medical doctor and an assistant professor at

Vanderbilt University and Meharry Medical College, testified that he treated the Petitioner for depression in 2003 for three months. He prescribed Zoloft for the Petitioner's depression and Ambien for his related sleep difficulties. Dr. Okpaku said he knew of reports where some people who took Ambien fell asleep and did not know they were completing tasks, such as driving. He agreed that "the more Ambien that's prescribed the more likely" such incidents would occur. Dr. Okpaku stated that the drugs he prescribed for the Petitioner could cause confusion and agitation, but he said that "most of the drugs that [he] prescribe[d] can cause confusion." Dr. Okpaku was not aware of an FDA warning that people who take Ambien need to get at least eight hours of sleep after taking it. He felt that the warnings for taking Ambien were "common sense." Dr. Okpaku added that he normally does not prescribe refills. On redirect, Dr. Okpaku said that it was possible the Petitioner had not taken the Ambien as he prescribed it.

On cross-examination, Dr. Okpaku said that prior to the sentencing hearing, he last saw the Petitioner in January 2004.[FN2] He stated that he normally prescribed a medicine for four weeks and that he had no record of prescribing any medication to the Petitioner after February 2004. Dr. Okpaku said he did not know what the Petitioner's mental state was during the guilty plea hearing, but he stated that the medicine he prescribed was to help the Petitioner think more clearly.

[FN2.] We note that the Petitioner's guilty plea hearing was held on June 10, 2004.

Frankie Shockley, the Petitioner's mother, testified that she hired Counsel to represent the Petitioner on the charges of rape of a child and aggravated sexual battery. She met with Counsel at his office to discuss the plea agreement, and she understood that the Petitioner "would get ... probably eight years or maybe less." She thought the worst-case scenario was eight years. Shockley said the Petitioner was upset at receiving eight years as a sentence, and he walked out of the meeting. Shockley further described the Petitioner's mood, and she said, "He ... just seemed to be just not knowing what was going on." She elaborated that he "was depressed.... Very depressed." She said the Petitioner had trouble sleeping, and the medication he took to help him sleep made him "lifeless" and caused him to "just lay around." Shockley then testified that she was very surprised at the sixteen-year sentence the trial court imposed, and she opined that she "felt like two or three years with some counseling would be plenty." Shockley clarified that she was not present at the plea hearing.

On cross-examination, Shockley recalled that Counsel talked about the Petitioner's sentences possibly "stacking," but she did not recall hearing about "consecutive sentences." She described her son's mental state the morning of the plea hearing as "very confused" to the point where he "didn't know what was happening."

Janet Brewster, a life-long neighbor of the Petitioner, testified that she talked with the Petitioner in the span between his guilty plea hearing and his sentencing hearing. She opined that the Petitioner did not understand the charges against him or how much time he could serve. Brewster said she tried explaining to the Petitioner what the charges meant, which included telling him that "aggravated" meant "violent" and that the crime involved a child under thirteen years old.

On cross-examination, Brewster stated that she heard from the Petitioner's mother about the guilty plea and that she subsequently researched those crimes. The Petitioner's mother told Brewster that the Petitioner did not understand the charges. Brewster said she wanted to clarify the Petitioner's lack of understanding with the court, but she did not want the judge to find her in contempt of court for "standing up and saying this is a one-sided hearing." Brewster said she was dissatisfied with the sentencing hearing.

For the State, Counsel testified that he was a criminal defense attorney and that he represented the Petitioner throughout the proceedings. He said he discussed each charge and the possible penalties with the Petitioner prior to the plea hearing. Counsel stated that there was no "question in [his] mind that [the Petitioner] knew that he was alleged to have engaged in sexual behavior with a child under the age of thirteen." They discussed the requirements of penetration and touching, and Counsel informed the Petitioner of the sentence ranges of fifteen to twenty-five years at one hundred percent for rape of a child and eight to twelve years at one hundred percent for aggravated sexual battery. Counsel said he also told the Petitioner that he would likely receive consecutive sentences if he went to trial. Counsel negotiated the plea deal with the State for four counts of aggravated sexual battery. He said he discussed "the good, the bad, and the ugly" of each offer from the State with the Petitioner.

Counsel said that, when he met with the Petitioner and his family, they discussed each offer and its possible sentence range. He said he explained that, with the four counts of aggravated sexual battery, the Petitioner could serve from eight to forty-eight years. Counsel stated

that he never suggested the Petitioner would serve less than eight years or that the Petitioner could receive a better plea offer. Counsel then testified that nothing suggested the Petitioner did not understand the ramifications of pleading guilty. Counsel said of the Petitioner, "He was clearly upset, but not that he did not understand what he was doing." Counsel assured the Court that he would have asked for a continuance if he felt the Petitioner was not "of sound mind."

Counsel said that, between the plea hearing and the sentencing hearing, he explained to the Petitioner the purpose of a sentencing hearing and reiterated that he pled guilty to aggravated sexual battery, and not simply sexual battery, because the victim was under thirteen years of age at the time of the offense. He also explained to the Petitioner that at the sentencing hearing they needed to convince the court the Petitioner was a first time offender and should serve concurrent minimum sentences. Counsel then said he called witnesses on the Petitioner's behalf at the sentencing hearing. Counsel stated that neither the Petitioner nor any member of his family wanted to withdraw the guilty plea. Counsel concluded by saying there was nothing he could have done better on this case.

On cross-examination, Counsel testified that he met "numerous" times with the Petitioner and the Petitioner's mother before the plea hearing. He also met several times with the Petitioner at the jail between the plea hearing and the sentencing hearing. Counsel did not recall the Petitioner ever saying he wanted to withdraw his plea, and he said he would have withdrawn the plea if the Petitioner wanted to do so. Counsel said it was "most likely" that he went over the plea petition with the Petitioner the morning of the plea hearing. While going over the plea petition, Counsel had the Petitioner read it and ask him any questions. He is "sure" that he explained the Sex Offender Registry to the Petitioner, although he does not specifically recall discussing it with the Petitioner. Counsel stated that he felt the deal was good. Counsel did not remember asking the Petitioner if he was taking any medication, and he does not remember the trial court asking the Petitioner such a question, either.

*State v. Shockley*, 2009 WL 856984, at **2-5.

## III.    STANDARD

Title 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act

of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996),  provides the following with respect

to granting a writ of *habeas corpus* to prisoners who are in custody pursuant to a state court judgment:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Where state courts have made factual determinations regarding issues presented for federal *habeas corpus* review, such determinations are presumed to be correct, and the petitioner has the burden of rebutting that presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The purpose of federal *habeas corpus* review is to "ensure that state court convictions are given effect to the extent possible under the law," not to conduct a federal re-trial. *Bell v. Cone*, 535 U.S. 685, 693 (2002).

### A.       Ineffective Assistance of Counsel

As the first ground of his petition for *habeas corpus* relief, the petitioner contends that he received ineffective assistance of counsel. (Docket No. 1 at p. 5). The petitioner alleges three specific ways in which he believes his counsel was ineffective. These theories are set forth as "sub-claims" in his petition. First, the petitioner alleges that his attorney:

> failed to ensure that his client was competent to enter into a Plea

Agreement with the state, knowing that the petitioner was and had been under the care of a licensed psychologist in an attempt to deal with the situation these convictions are related to. As a result of this treatment the petitioner was under the influence of mind altering drugs prescribed by his Doctor. Mr. Ryan [his attorney] failed to request a competency hearing, and when the court asked, Mr. Ryan stated his client did not need one.

(Docket No. 1 at p.5). Second, the petitioner alleges that his attorney failed to explain the consequences of waiving certain rights by pleading guilty. (*Id*.) Third, the petitioner alleges that his attorney failed to fully investigate all aspects of the petitioner's defense. (*Id*.) The court will address each argument in turn.

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. *See Bell v. Cone*, 535 U.S. 685, 694-95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 686-87 (1984); *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000), *cert. denied*, 531 U.S. 1035 (2000). In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. Reasonable attorneys may disagree on the appropriate strategy for defending a client. *Bigelow v. Williams,* 367 F.3d 562, 570 (6th Cir. 2004).

The prejudice element requires a petitioner to show "that there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. To establish prejudice in the context of a guilty plea, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985); *Miller v. Straub*, 299 F.3d 570, 578 (6th Cir. 2002).

A court hearing an ineffective assistance of counsel claim must consider the totality of the evidence. *Strickland,* 466 U.S. at 695. "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996)(quoting *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992)(*en banc*)). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.

### 1.      Sub-claim One

In his first "sub-claim," the petitioner contends that trial counsel was ineffective when he:

> failed to ensure that his client was competent to enter into a Plea Agreement with the state, knowing that the petitioner was and had been under the care of a licensed psychologist in an attempt to deal with the situation these convictions are related to. As a result of this treatment the petitioner was under the influence of mind altering drugs prescribed by his Doctor. Mr. Ryan [his attorney] failed to request a competency hearing, and when the court asked, Mr. Ryan stated his client did not need one.

(Docket No. 1 at p. 5). The respondent contends that the petitioner has failed to fully exhaust this claim and therefore the claim should be summarily dismissed. (Docket No. 13 at pp. 23-24). Alternatively, the respondent contends that the state appellate court's findings that the petitioner received effective assistance of counsel and that Shockley knowingly, voluntarily, and intelligently pleaded guilty was in complete harmony with the standards set forth on this issue by the United States Supreme Court. (*Id.* at p. 17).

To satisfy the dictates of due process, guilty pleas not only must be voluntary but they must have been knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences. *Brady v. United States,* 397 U.S. 742, 747-48 (1970)(citing *Boykin v. Alabama*, 395 U.S. 238, 242 (1969)). The record should reflect a full understanding of the direct consequences so that the plea represents a voluntary and intelligent choice among alternatives. *See North Carolina v. Alford,* 400 U.S. 25, 31 (1970). "While a defendant need not know all the possible consequences of his plea, like the loss of his right to vote or own a gun, or the effect on future sentence, he must be aware of the maximum sentence to which he is exposed." *Ruelas* v. *Wolfenbarger*, 580 F.3d 403, 408 (6th Cir. 2009).

A state court's determination that a guilty plea was valid is a factual finding entitled to a presumption of correctness on federal *habeas* review, rebuttable only by clear and convincing evidence. *Garcia v. Johnson,* 991 F.2d 324, 326 (6th Cir.1993); *see also* 28 U.S.C. § 2254(e)(1). When a defendant brings a federal *habeas* petition challenging his plea, the state generally satisfies its burden by producing a transcript of the state court proceeding. *Garcia,* 991 F.2d at 326. However, when the transcript is inadequate to demonstrate that a plea was voluntary and intelligent, the presumption of correctness no longer applies. *Id.* at 327.

On appeal to the state appellate court from the denial of post-conviction relief, Shockley argued that "he did not plead guilty knowingly and voluntarily because (1) he was under the effects of medication that compromised his ability to think; and (2) he was not informed that he would have to register as a sex offender." (Addendum L at p.6, *Shockley v. State*, No. M2008-00143-CCA-R3-PC, 2009 WL 856984 (Tenn. Crim. App. Mar. 31, 2009)). As to Shockley's claim that his competence was at issue during his plea hearing due to the prescription medication he allegedly had taken, Shockley argued to the post-conviction court that "because he took several Ambien the night before the plea hearing, his decision-making abilities were compromised, and that, therefore, he did not act in a knowing or voluntary manner when pleading guilty." (Addendum L at p. 7; Addendum D at p. 112-13). The post-conviction court denied the petitioner's petition for relief on this ground, finding:

> The Court finds that there is nothing, other than the testimony of the Petitioner, that would indicate that the Petitioner was under the influence of Ambien at the time of his plea such that he would have been unable to understand the plea agreement and ma[k]e a knowing, voluntary, and intelligent decision to accept the State's offer. The Court finds that the Petitioner has failed to carry his burden in
>
> proving that he was under the influence of medication such that he was unable to make a knowing, voluntary decision.

(Addendum L at p.7)(citing post-conviction court's ruling). On appeal to the Tennessee Court of Criminal Appeals, the state appellate court determined:

> After reviewing the totality of the circumstances, we agree with the post-conviction court that the Petitioner has failed to prove that he was under the influence of medication at the time he entered his plea. The record demonstrates that the Petitioner adeptly and correctly answered each one of the trial court's questions during the guilty plea proceeding. The trial court clearly and accurately explained the charges facing the Petitioner and the potential implication of those charges. Counsel found the Petitioner to be of sound mind during the

> hearing and noticed no indication that the Petitioner was under the influence of any medication. Counsel testified he explained to the Petitioner in detail the charges and the plea offer and agreement. Under these circumstances, we conclude that the Petitioner has not proven that he was under the influence of any medication at that time of his guilty plea hearing. The Petitioner is not entitled to relief on this issue.

(*Id.*)

The court finds that petitioner has not rebutted the state courts' factual determinations, which are entitled to a presumption of correctness on federal *habeas* review. *Garcia v. Johnson,* 991 F.2d 324, 326 (6th Cir.1993). The record demonstrates that Shockley's trial counsel was satisfied that Shockley was competent to enter into his pleas of guilty, and that he did so knowingly, voluntarily, and intelligently. Counsel testified that nothing suggested that Shockley did not understand the ramifications of pleading guilty. *Shockley v. State*, No. M2008-00143-CCA-R3-PC, 2009 WL 856984, at *5 (Tenn. Crim. App. Mar. 31, 2009)(Addendum L). Counsel said of Shockley: "He was clearly upset, but not that he did not understand what he was doing." *Id.* Counsel assured the court that he would have asked for a continuance if he felt Shockley was not "of sound mind." *Id.* The post-conviction court accredited trial counsel's testimony that he did not have any indications that the petitioner was not of sound mind. *Id.* The state courts' rulings were based on a reasonable determination of the facts in light of the evidence presented.

Shockley takes issue with the fact that the trial court judge did not ask Shockley if he had taken any prescription medication before accepting his plea. In *United States v. Shan Wei Yu*, 484 F.3d 979 (8th Cir. 2007), the Eighth Circuit considered the appellant's claim that the district court should have ordered a mental competency hearing because the defendant had been taking prescription medication for mental health problems and because he had complained to the court

about the performance of his attorneys. *Id.* at 985. On appeal, the Court rejected the appellant's claim, noting that "[n]o party suggested at trial . . . that Yu was incompetent or unable to understand the proceedings," and reasoning that "Yu's complaints about his attorneys . . . evidence that Yu understood the case against him and was capable of consulting with counsel." *Id.* Such was the situation in the present case. There was no indication that the petitioner was incompetent or unable to understand the plea proceedings. The petitioner has not shown otherwise.

The court finds that the post-conviction court and the state appellate court reasonably applied clearly established federal law in determining that Shockley had failed to meet his burden of showing that his plea was not made knowingly, voluntarily, and intelligently. The court agrees with the state courts that the petitioner has adduced no evidence which would cause the court to conclude that the plea was not entered knowingly and voluntarily. Thus, the petitioner is not entitled to relief on this claim.

### 2.     Sub-claim Two

In his second "sub-claim," the petitioner contends that trial counsel was ineffective because he failed to explain the consequences of waiving certain rights by pleading guilty. (Docket No. 2 at p. 3). The respondent concedes that the petitioner has fully exhausted this claim. (Docket No. 13 at p. 16).

In considering the petitioner's argument that his counsel had failed to review the plea agreement with Shockley prior to the entering of his guilty plea, the state post-conviction court found that trial counsel had: (1) adequately and effectively explained the State's offer; (2) explained to petitioner the charges to which he could plead guilty; (3) explained to petitioner the range of

sentences each offense carried; (4) explained to petitioner that he could receive between eight (8) years and twelve (12) years for each conviction; (5) explained to petitioner that the aforementioned sentences could be ordered to run concurrently or consecutively and that he could serve as few as eight (8) years but as many as forty-eight (48) years in prison; (6) explained to petitioner the meaning of being sentenced at 100%; (7) explained to petitioner the nature of the charges against him; (8) explained to petitioner that whatever sentence he was ordered to serve would be required to be served at 100% because the victim was under thirteen (13) years of age at the time of the offenses; (9) explained to petitioner the contents of the petition to enter a guilty plea form on the date of the guilty plea; and (10) that trial counsel informed petitioner that his plea agreement contemplated that he would be classified as a sex offender and forced to register on the Sex Offender Registry. (Addendum D, pp. 108-115). As a result, the post-conviction court found that Shockley had failed to carry his burden on his claim that he had not been informed of the consequences of a guilty plea. (Addendum D, p. 115).

On appeal of the denial of post-conviction relief, Shockley argued that his guilty plea was not knowingly and voluntarily entered and that he received ineffective assistance of counsel <u>only</u> because he "was not informed that he would have register as a sex offender." (Addendum L at p. 6). The Tennessee Court of Criminal Appeals considered and rejected Shockley's sex offender registry argument both grounds. As to the former, the state appellate court found:

> The Petitioner claims that his guilty plea was not knowingly or voluntarily entered because he was not aware that he would have to register as a sex offender as a result of his conviction. The State argues that both Counsel and the trial court informed the Petitioner that he would have to sign up on the sex offender registry.
>
> The post-conviction court found that Counsel informed the Petitioner "that his plea agreement contemplated that he would be classified as

a sex offender and forced to register on the Sex Offender Registry." It found that the Petitioner did not provide any proof that he was uninformed about having to sign up with the Sex Offender Registry and that the Petitioner failed to carry his burden on this issue.

On review, we conclude that the Petitioner has not proven that he was unaware he would have to register with the sex offender registry. Counsel testified that he regularly explains the sex offender registry to his clients who are convicted of sex crimes. Additionally, the trial court spoke with the Petitioner about the registry:

> The Court: Now, do you, also understand that this will be four convictions on your record, sex related offenses that will be on your record, no matter what happened with regard to the sentence, . . . when you are parolled [sic], at some time in the future, you would have these on your record. You, also, have to sign up on the sexual registry and -- and so forth, have certain kind[s] of treatment, probably, definitely, I think. And that's all a part of this, also. And do you understand that?

> The [Petitioner]: Yes, sir.

The trial court explained to the Petitioner that he would have to register as a sex offender and that there were certain consequences of such a registration. The Petitioner is not entitled to relief on this issue.

(Addendum L, at p.8). The record clearly shows that, despite his after-the-fact objections to the contrary, Shockley knew he would be required to comply with the sex offender registry law.

The state appellate court went on to analyze the petitioner's instant "sub-claim" as a pure ineffective assistance of counsel claim:

> The Petitioner claims that he received the ineffective assistance of counsel because Counsel failed to inform him that he had to register as a sex offender. The State counters that Counsel informed the Petitioner that he had to register. The post-conviction court found that Counsel believed he informed the Petitioner about having to register and that the Petitioner failed to carry his burden otherwise.

> On review, we conclude that the Petitioner has not proven that Counsel was deficient for failing to inform the Petitioner about the

22

> sex offender registry requirements. Counsel informed the Petitioner
> about the requirements of the plea, which included having to register
> as a sex offender. (citation omitted) Further, even if we were to
> conclude otherwise, the Petitioner has failed to prove prejudice. As
> previously stated, the trial court informed the Petitioner at the guilty
> plea about the requirement that he register with the sex offender
> registry, and the Petitioner indicated that he understood that
> requirement. He cannot show, therefore, that he would not have pled
> guilty if Counsel had informed him about the sex offender
> registration requirement. *See Strickland*, 466 U.S. at 694; (citation
> omitted). The Petitioner is not entitled to relief on this issue.

(Addendum L, at pp. 10-11).

The court notes that, in his petition for state post-conviction relief, Shockley alleged as a ground for relief that trial counsel failed to file a motion to withdraw Shockley's guilty plea even though Shockley allegedly asked him to do so. (Addendum D, p. 109). The post-conviction court denied the petition on this ground, crediting trial counsel's testimony that he met with Shockley after the entry of the guilty plea but before sentencing and that Shockley did not request him to file a motion to withdraw the guilty plea. (*Id*. at pp. 109-10). Although Shockley does not specifically raise this theory in the instant petition, the court notes that the Tennessee Court of Criminal Appeals also rejected this theory:

> The Petitioner argues that Counsel was ineffective for failing to file
> a motion to withdraw his guilty plea, which, he asserts, he asked
> Counsel to do. The State argues that, relying on the post-conviction
> court's findings of fact, the Petitioner never asked Counsel to
> withdraw the guilty plea. After considering this issue, the
> post-conviction court found that the Petitioner never asked Counsel
> to withdraw his guilty plea. It wrote that the Petitioner "provided
> insufficient evidence to substantiate his claim that he sought such a
> motion."
>
> On review, we agree with the State. Relying on the post-conviction
> court's findings of fact, the Petitioner never asked Counsel to
> withdraw his guilty plea. As such, Counsel could not have been
> deficient for failing to file a motion to withdraw the guilty plea.

(Addendum L at p.11).

The court agrees with the Tennessee Court of Criminal Appeals that, <u>even if</u> Shockley could show that his counsel was deficient in failing to inform Shockley that he must register as a sex offender, Shockley cannot show prejudice. Shockley cannot show that he would not have entered a guilty plea had he known about the sex offender registry requirement because the record clearly shows that, even if his counsel had failed to inform him of the registry requirement, the <u>trial court</u> informed Shockley at the plea hearing of the registry requirement. Shockley indicated that he understood the requirement and then Shockley proceeded to plead guilty. The record suggests that it was only after Shockley learned of his sentence, a sentence over which he admittedly became upset because he was sentenced to sixteen years instead of the expected eight, (see *v. Shockley*, 2009 WL 856984, at **2-5), that Shockley desired to withdraw his guilty plea.

In sum, the court finds that the Tennessee Court of Criminal Appeals correctly applied federal law and reasonably determined the facts in concluding that Shockley was not entitled to any relief on this sub-claim.

### 3. Sub-claim Three

The petitioner's third sub-claim is that his counsel was constitutionally ineffective by failing to "fully investigate all aspects of the petitioner's defense." (Docket No. 1 at p.5). The respondent contends that the petitioner has failed to fully exhaust this claim and therefore the claim should be summarily dismissed. (Docket No. 13 at p. 16). Alternatively, the respondent contends that the state appellate court's findings that the petitioner received effective assistance of counsel and that trial counsel properly investigated the petitioner's defense are consistent with the standards set forth on

24

this issue by the United States Supreme Court. (*Id*. at p. 16).

This sub-claim or theory does not appear in Shockley's petition for state post-conviction relief or in his amended petition. (Addendum D, pp. 34-36, 83-91). It is not addressed in the order of the post-conviction court denying relief. (Addendum D, pp. 97-116). As pointed out by the respondent, the opinion of Tennessee Court of Criminal Appeals affirming the judgment of the post-conviction court does not even contain the word "investigate," the key word in Shockley's third sub-claim. (Docket No. 13 at p. 30 citing Addendum L). As such, the court cannot find that the petitioner has fully and fairly presented this particular federal claim to the state courts for consideration. Thus, the petitioner has never exhausted this sub-claim.

At this time, the state court remedies for this claim are no longer available. *See* Tenn. Code Ann. § 40-30-102(a) and (c). Therefore, by way of procedural default, the petitioner technically has met the exhaustion requirement with respect to this claim. *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002)(if an unexhausted claim would be procedurally barred under state law, that claim is procedurally defaulted for purposes of federal *habeas corpus* review).

The exhaustion of a claim via procedural default does not, however, automatically entitle a *habeas* petitioner to federal review of that claim. To prevent a *federal habeas* petitioner from circumventing the exhaustion requirement in such a manner, the Supreme Court has held that a petitioner who fails to comply with state rules of procedure governing the timely presentation of federal constitutional issues forfeits the right to federal review of those issues, absent cause for the noncompliance and some showing of actual prejudice resulting from the alleged constitutional violations. *Gray v. Netherland*, 518 U.S. 152, 162 (1996).

A *habeas* petitioner cannot rely on conclusory assertions of cause and prejudice to overcome

the adverse effects of a procedural default. Rather, he must present affirmative evidence or argument as to the precise cause and prejudice produced. *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006). To demonstrate cause, the petitioner must show that an objective factor external to the defense interfered with his ability to comply with the state procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To establish prejudice, there must be a showing that the trial was infected with constitutional error. *Brooks v. Tenn.*, 626 F.3d 878, 890 (6th Cir. 2010).

Here, the petitioner makes no effort to demonstrate cause and prejudice for his procedural default. Even if the petitioner offers his counsel's alleged ineffective assistance as cause for the procedural default, the petitioner's allegations of ineffective assistance of counsel are unavailing for the reasons discussed herein. Moreover, the petitioner's allegation that his counsel failed to properly investigate his defense is so broad and unspecific that the court, like the respondent, is left to wonder in what ways the petitioner believes his trial counsel allegedly failed to investigate the petitioner's defense. However, the burden is on the petitioner, and the burden has not been met. Consequently, the court finds that this sub-claim, like the petitioner's other sub-claims alleging ineffective assistance of counsel, will not support an award of *habeas corpus* relief.

When the district court denies a ground for relief on the merits in a *habeas corpus* action, a certificate of appealability "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the standard being whether "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because the petitioner has not made a substantial showing of a constitutional right, a certificate of appealability should not issue with respect to the petitioner's first ground for relief, ineffective assistance of counsel.

**B.      Consecutive Sentencing**

As recounted above, the trial court ordered counts five (5) and six (6) of the defendant's four (4) aggravated sexual battery convictions to run consecutively to one another. (Addendum B, Docket No. 14-2, p. 112). This sentence resulted in a total effective sentence of sixteen (16) years imprisonment for Shockley. (*Id*.) As the second ground of his petition for *habeas corpus* relief, the petitioner alleges that "[t]he ruling by the Trial Court, Court of Criminal Appeals, and the Tennessee Supreme Court is contrary to previous decisions in determining whether a defendant should receive concurrent or consecutive sentences." (Docket No. 1 at p.5). In particular, the petitioner alleges that, by failing to cite the specific reasons for imposing consecutive sentences, the trial court did not comply with Tennessee Rule of Criminal Procedure 32(c)(1), which requires that a trial court "specifically cite the reasons" for its imposition of a consecutive sentence. (Docket No. 2 at p. 5). The respondent concedes that the petitioner has exhausted this claim. (Docket No. 13 at p. 31).

The trial court imposed consecutive sentences on the petitioner pursuant to subsection 5 of Tennessee Code Annotated § 40-35-115(b), which provides for consecutive sentencing in the discretion of the trial judge when:

> The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

Tenn. Code Ann. § 40-35-115(b)(5)(2003). In imposing consecutive sentences pursuant to this statute, the trial judge stated:

I think, under the judgment of this Court, that this man should be sentenced to what is, actually, the minimum sentence, under the law, for each of these four counts, which is eight years, at one hundred percent. But I, also, think that under Section 40-35-155(5) [sic], where you have two or more statutory offenses involved in sexual abuse of a minor–this is an eleven, twelve-year-old–and that aggravating circumstances arising from this relationship have impacted this little girl as it has, and where the there is a time span of, maybe, two years in this case of undetected sexual activity. I couldn't believe when I heard that, apparently, when this man was going on his honeymoon, this is when this first happened, apparently, in Gatlinburg, according to . . . the testimony of . . . Ms. Arnold, and apparently, went on for a period of time after that.

So I think the nature, the extent of the acts, and the residual, physical and mental damage to this little girl, everything I've already said before, causes this Court to believe that at least one of these counts should run consecutively to the other.

(Addendum B, Docket No. 14-2, pp.111-12).

On direct appeal, the petitioner argued that the trial court erred by ordering consecutive sentences. (Addendum G, Docket No. 14-7, p. 13). In considering the petitioner's claim, the Tennessee Court of Criminal Appeals quoted the language of Tenn. Code Ann. § 40-35-115(b)(5) and noted that, under the statute, the trial court had the discretion to order consecutive sentences if it found any one of a number of different criteria to exist by a preponderance of evidence. (Addendum I, Docket No. 14-9, p.9). Addressing the appellant's argument that there was insufficient evidence of any residual damage suffered by the victim as a result of the abuse and, thus, insufficient proof to support consecutive sentences under criterion (5) of the statute, the appellate court disagreed and found that "[t]he evidence was more than sufficient to support a finding that criterion (5) of the consecutive sentencing statute applied under the circumstances presented by the case." (Addendum I, Docket No. 14-9, p. 9)(emphasis added). In support of its finding, the

appellate court cited "detailed evidence . . . that the victim . . . had suffered and was continuing to suffer numerous deleterious effects of the abuse," including the testimony by clinical therapist Holly Arnold that, "out of all the children of sexual abuse she had counseled over the years, she would place the victim as a nine on a scale of one to ten in terms of the negative impact the defendant's actions had had on her life." (*Id.* at pp. 8-9). The appellant court thus concluded "that the trial court did not err in ordering consecutive sentences pursuant to Tennessee Code Annotated section 40-35-115(b)(5)." (Addendum I, Docket No. 14-9, p. 8).

A petition for federal *habeas corpus* relief may <u>only</u> be granted when it is found that a citizen is in custody in violation of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); *Pulley v. Harris*, 465 U.S. 37, 41 (1984). A federal district court is not to reexamine decisions made by a state court on an issue of state law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Because federal *habeas corpus* relief is only available to remedy errors of a federal nature, a claim that a conviction is the result of a state court's misapplication of state law is not cognizable unless the petitioner can establish such error amounts to a fundamental miscarriage of justice or a violation of the right to due process in violation of the United States Constitution. *Floyd v. Alexander*, 148 F.3d 615, 619 (6th Cir. 1998); *see Abshear v. Moore*, 354 Fed. Appx. 964, 968 (6th Cir. 2009)(federal *habeas corpus* relief does not lie for errors of state law).

At the state court level and now, no federal question has been presented with respect to petitioner's sentence. The petitioner did not and does not claim that he is being held in violation of the United States Constitution or federal laws. The petitioner presented this issue to the state appellate court on direct appeal and the issue was decided by the court solely pursuant to state law. The state courts have determined that the defendant's actions warranted consecutive sentencing

under Tennessee Code Annotated § 40-35-115(b). Because the court must accept as valid the Tennessee court's interpretation of Tennessee statutes and rules of practice, *Estelle*, 502 U.S. 62, 67-68, and the petitioner has not shown how the state courts' rulings constituted a fundamental miscarriage of justice or deprived petitioner of the right to due process under the United States Constitution, this claim raises no issue on which *habeas corpus* relief may be granted.

When the district court denies a ground for relief on the merits in a *habeas corpus* action, a certificate of appealability "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the standard being whether "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because the petitioner has not made a substantial showing of a constitutional right, a certificate of appealability will not issue with respect to the petitioner's second ground for relief.

## IV.    RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that the petition be **DENIED**, Rule 4, Rules - - - § 2254 Cases, and that the petitioner's claims be **DISMISSED** with prejudice. The undersigned further **RECOMMENDS** that a certificate of appealability not issue as to any of the petitioner's claims.

The parties have fourteen (14) days of being served with a copy of this Report and Recommendation, to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this Report and Recommendation within fourteen (14) days after being served with a copy thereof. Failure to file specific objections

within fourteen (14) days of receipt of this Report and Recommendation may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

An appropriate order will enter.

s/ John S. Bryant
John S. Bryant
United States Magistrate Judge